**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| SHANNON W. COPE and | ) | |
| BONNIE HETTINGER, Individually and | ) | |
| On Behalf of All Others Similarly Situated, | ) | CIVIL ACTION NO. 2:08-cv-1642-CWH |
| | ) | |
| *Plaintiffs*, | ) | |
| vs. | ) | CLASS ACTION COMPLAINT |
| | ) | |
| FORCE PROTECTION, INC., FRANK | ) | |
| KAVANAUGH, GORDON R. McGILTON, | ) | |
| MICHAEL MOODY, | ) | **JURY TRIAL DEMANDED** |
| MICHAEL S. DURSKI and | ) | |
| RAYMOND W. POLLARD, | ) | |
| | ) | |
| *Defendants*. | ) | |

**CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS**

**INTRODUCTION**

1.      This securities class action is filed against Force Protection, Inc. ("Force Protection" or the "Company"; Nasdaq Ticker Symbol: FRPT) and some of its officers and/or directors on behalf of all individuals who purchased or otherwise acquired the common stock of Force Protection between August 14, 2006 and February 29, 2008 (the "Class Period"), for violations of the Securities Exchange Act of 1934 ("Exchange Act").

2.      Force Protection and its subsidiaries manufacture ballistic and blast-protected vehicles that are sold almost exclusively to various armed forces of the United States of America, the United Kingdom, and the government of Iraq.

3.      Force Protection is incorporated under the laws of Nevada, but its main offices are located at 9801 Highway 78, Building No. 1, Ladson, South Carolina.

4.      During the Class Period, defendants issued materially false and misleading statements regarding the Company's business, financial results and prospects.  As a result of

defendants' false statements, the stock price of Force Protection was artificially inflated during the Class Period; it reached a high of $30.27 per share on May 30, 2007.

*The Business Operations of Force Protection Depended on Government Contracts that, Often, Were Not Competitively Bid.*

5.     In 2002, Force Protection began to specialize in the design and manufacture of Mine Resistant Ambush Protected ("MRAP") vehicles.  MRAP vehicles are designed to survive improvised explosive device ("IED") attacks and ambushes.

6.     Force Protection produces three series of MRAP vehicles: (1) the Buffalo series; (2) the Cougar series; and (3) the Cheetah series. The Cougar series is the Company's flagship series.  The Cheetah series is the Company's newest series that it has recently developed.  The Company has not yet sold nor accepted any orders for the Cheetah series.

7.     The United Stated Department of Defense is the main customer for the MRAP Force Protection produces.  The Department of Defense purchases those vehicles for both the Army and Marine Corps.

8.     Department of Defense procurement, and procurement for each branch of the Armed Forces, is done in one of two ways: the first is a "sole source" contracting process, where only one company is allowed to bid for the work.  The second is an "open competition"—or competitive bidding—process.  In that process, several companies are allowed to compete for work based on specifications developed by the customer.

9.     Two essential characteristics any company must have to secure government contracts are the ability to produce a timely product at a sufficient quantity to fulfill the volume needs of the customer, and a high-quality product that provides the battlefield capabilities that the customer expects of the product.

10.    Many of the Company's Cougar-class vehicles were purchased by the Marine Corps under the sole source procurement process, because Force Protection was understood to be the industry leader for producing the type of vehicle that would meet the requirements that the Marines had set forth.  Peter Eisler, *The Truck the Pentagon Wants and The Firm that Makes It*,

USA Today (Aug. 1, 2007), *at* http://www.usatoday.com/news/military/2007-08-01-force-protection-mraps_N.htm (last visited April 3, 2008).

11.    Those sole source contracts were the source for most of the Company's flush economic times, but they were not without their own controversy:

> Force Protection, which a few years ago barely sold enough vehicles to stay alive, now has sold more MRAP-type trucks to the military than any other maker, hauling in $1.3 billion in contracts to build 2,200 vehicles. Competitors, however, are rapidly catching up.
>
> ***The company has thrived despite fines and criticism from the Pentagon's inspector general for failing to deliver vehicles on time as it struggled to boost its production.*** That's because Force Protection was the first U.S. manufacturer to supply a vehicle that military commanders in Iraq had requested repeatedly since the first Cougars began trickling into the country in 2004.

*Id*.

12.    The claims that the Company made both before and during the Class Period, contending that Force Protection dominated the market for MRAP vehicles because of its superior product design and rapid delivery rates, however, were undermined by a June 27, 2007, Department of Defense Inspector General Report. In that report, the Inspector General questioned why Force Protection was awarded sole source contracts when there were other American companies that could have offered products similar to the Force Protection Cougar at a faster production rate.

13.    Force Protection repeatedly missed its delivery deadlines, according to the report. Force Protection missed 98% of its order deadlines—even after extensions granted by the Government—and faced up to $6.7 million in liquidated damages.

14.    The Marine Corps even went so far as to amend its contracts to allow Force Protection to escape the liquidated damages provisions in those contracts, because of the potential devastation a $6.7 million hit could do to the Company.

15.    The report stated that Force Protection "did not perform as a responsible contractor and repeatedly failed to meet contractual delivery schedules" under the procurement requirements that the Government had set forth.

16.    Shortly after the IG report was released, the Marine Corps determined that it would no longer award single source contracts to Force Protection for its Cougar series vehicles.

17.    That decision by the Marine Corps cost Force Protection its position as the industry leader in blast-protected armored vehicles.  It was unable to compete in a competitive-bidding marketplace.

*Force Protection Executives Submit False Sarbanes-Oxley Act Certifications.*

18.    Defendants Gordon R. McGilton, the former President of the Company, and Michael S. Durski, the former CFO of the Company, falsely certified each quarter that, under section 404 of the Sarbanes-Oxley Act (SOX), they had "[e]valuated the effectiveness of . . . disclosure controls and procedures" and disclosed all "significant deficiencies in the design or operation of internal controls" over financial reporting which were reasonably likely to "adversely affect the [Company's] ability to record, process, summarize and report financial data."  Each of these so-called SOX certifications was false and misleading when made.

19.    Force Protection and its executives had no reasonable basis for their section 404 certifications, because they had a total lack of adequate internal controls—a fact that would be revealed only during the process of curative earnings restatements.  This deficiency was caused, at least in part, by software Force Protection purchased from a company related to defendant McGilton.

20.    Companies that contract with the Government must meet heightened financial control requirements, because they are being paid from the public fisc.  Force Protection has failed numerous times to meet the requirements of the Defense Contract Audit Agency, which repeatedly has criticized Force Protection's financial controls.  On a going forward basis, it is possible that the conduct discussed here could impair the ability of Force Protection to contract with the Government—a virtual death-blow to a defense contractor.

*Force Protection Reveals its Misconduct.*

21.    On February 29, 2008, after the market closed, Force Protection issued a press release entitled "Force Protection Announces Delay in 2007 Form 10-K and Required

Restatement of Form 10-Q for the Period Ended September 30, 2007," in which it stated that the Company would not file its annual report timely with the Securities and Exchange Commission:

> Force Protection, Inc. today announced that it will delay the filing of its Annual Report on Form 10-K for the year ended December 31, 2007. The Company intends to file its Annual Report on Form 10-K for the year ended December 31, 2007 with the SEC promptly upon the completion of the audit of the consolidated financial statements for the year ended 2007.

> Force Protection today also announced that the Company's Audit Committee concluded that the *Company will restate its previously reported interim financial statements for the three and nine month periods ended September 30, 2007*. The Company will file a Form 8-K with the Securities and Exchange Commission with regard to this restatement decision.

> The Company reached the conclusion to restate based upon the recommendation of management and the concurrence of the Audit Committee of the Company's Board of Directors. The Company also discussed the matters related to the restatement with Elliott Davis, LLC, the Company's current independent registered public accounting firm. Therefore, the previously issued financial statements of the Company for the third quarter of 2007 filed on a Form 10-Q on November 13, 2007 should no longer be relied upon. Management discovered *significant accounting errors* during its year end review, including errors specifically related to the recording of accounts payable related to inventory purchased from a sub-contractor as a result of a contract termination.

> The Company continues to evaluate the impact of the matters described above on its internal control over financial reporting and the Company's disclosure controls and procedures. Management noted it had previously identified and described material weaknesses in its internal control over financial reporting in its Quarterly Report on Form 10-Q filing dated November 13, 2007. As a result of these previously identified material weaknesses and other deficiencies identified during the review of financial statements for the year ended December 31, 2007, management has concluded internal controls over financial report [sic] were not effective as of December 31, 2007. Additionally, management does not believe that the material weaknesses identified as of December 31, 2007 will be remediated by March 31, 2008 and anticipates that material weaknesses will be identified in its Quarterly Report on Form 10-Q for the first quarter of 2008.

Therefore, management expects that internal control over financial reporting is likely to be ineffective as of March 31, 2008.

22.     The Company simultaneously issued a Form 12b-25 on February 29, 2008, in which it confirmed with an official filing that it would not be able to meet its regulatory responsibilities:

Force Protection, Inc. (the "Company") has determined that it is unable to file its Annual Report on Form 10-K for the year-ended December 31, 2007 by the prescribed due date. As described in further detail below, the Company requires additional time to complete its evaluation of its internal control over financial reporting and preparation of the consolidated financial statements. The Company intends to file its Annual Report on Form 10-K for the year ended December 31, 2007 with the SEC promptly upon the completion of the audit of the consolidated financial statements for the year ended 2007 although it is possible that it will not be filed on or before March 17, 2008. In turn, Elliott Davis, LLC, the Company's independent registered public accounting firm, requires additional time to complete its audit procedures in order to provide the Company with its audit report on the audit of the financial statements and of the Company's internal control over financial reporting.

Although management has not yet completed its evaluation of the Company's internal control over financial reporting, management had, as of December 31, 2007, identified the following material weaknesses in internal control over financial reporting:

- Ineffective control over the financial statements closing process;

- Ineffective controls in accounting for inventory and the associated accounts payable expenses related to the receipt of inventory;

- Insufficient complement of personnel with an appropriate level of accounting knowledge, experience with the Company, and training in the application of general accepted accounting principles (GAAP) in the United States; and

- Ineffective controls over the completeness and accuracy of deferred tax balances.

6

In accordance with Section 404 of the Sarbanes-Oxley Act of 2002, the Company has been assessing the effectiveness of its internal control over financial reporting that existed as of December 31, 2007. As management's required assessment of internal controls over financial reporting is not complete, it is possible that the Company will identify one or more additional material weaknesses which, individually or in the aggregate, would constitute a material weakness in internal controls over financial reporting in accordance with Section 404 of the Sarbanes Oxley Act of 2002. Management has concluded that as a result of above-described the material weaknesses, internal controls over financial reporting are not effective as of December 31, 2007. Management also does not believe that the material weaknesses, or other deficiencies which may be identified, will be remediated by March 31, 2008. Therefore, the Company expects that internal control over financial reporting is likely to be ineffective as of March 31, 2008 and anticipates that material weaknesses will be identified in its Quarterly Report on Form 10-Q for the first quarter of 2008.

In addition, the Company has also determined that its previously filed interim financial statements for the three and nine month periods ended September 30, 2007 and all public communications of such financial statements should no longer be relied upon because those financial statements contain material misstatements of net income. Accordingly, the Company plans to restate its historical financial statements for the quarter ended September 30, 2007 and the Company is also reviewing its historical financial statements for the quarter ended June 30, 2007. The Company is working to complete the restatement of its financial statements for the quarter ended September 30, 2007 and to prepare its financial statements for the year ended December 31, 2007. The Company is also reviewing its accounting procedures and controls, and the financial reporting processes.

As a result of the scope of the work to be performed to complete its analysis and to identify the material weaknesses in the Company's internal control over financial reporting, including the need to restate its financial statements, it is not practicable for the Company to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2007 by the prescribed due date. The Company is working as expeditiously as possible to finalize the financial statements for the fiscal year ended December 31, 2007 and to file amendments to its previously filed Quarterly Report on Form 10-Q for the quarter ended September 30, 2007.

23.    After Force Protection began to reveal its misconduct, the market reacted with a swift drop in its share price.  On March 3, 2008, the Monday following its curative statements, shares of Force Protection closed at $3.58 per share—a one-day decline of 13%.  Trading volume also was exceptionally high, with approximately 3.5 million shares being traded—nearly twice the average three-month volume of FRPT trades.

24.    During the Class Period, Force Protection stock traded at a high of $30.27 per share.  The March 3 close price of $3.58 was an 88% decline from the Class Period high because of the misconduct that the Company revealed.

25.     The share price of Force Protection stock has continued its persistent and precipitous decline.  On March 17, 2008, Force Protection stock was trading at a meager $1.37 per share.

26.    On March 24, 2008, the Company received notice from Nasdaq that its stock was being delisted from that exchange, based almost entirely on the failure of the Company to provide accurate and timely financial reports to investors and regulatory agencies.

27.    The same day it was notified that its stock was being delisted, Force Protection also announced that its independent accounting firm, Elliott Davis, LLC, submitted its immediate resignation based on the fact that the absence of internal financial controls at Force Protection prevented the firm from rendering an adequate opinion of its real financial health.

28.    Force Protection did not name a new auditor until April 13, 2008, when it announced that it had hired Grant Thornton, LLP.

29.    During the Class Period, the defendants knew but did not disclose several material facts to the investing public or regulatory agencies.  Among the issues about which the defendants knew, but concealed from the market were the following:

(a)    Force Protection could not meet its delivery deadlines, and its competitiveness in the market would be impaired because of its poor reputation for timeliness.

(b)    Government audits criticized the Company's financial controls, which threatened the Company's eligibility to compete for government contracts.

(c) In addition to the material weaknesses and lack of appropriate financial controls, the Company's accounting department lacked the necessary staff and resources to perform its required functions.

(d) Contrary to its representations in SEC filings, Force Protection had inadequate internal controls that were easily manipulated, and multiple areas of the Company's internal controls suffered serious deficiencies, including: (i) the financial closing process; (ii) accounting for inventory and the associated accounts payable expenses; (iii) stock-based compensation; and (iv) deferred tax balances.

(e) The lack of effective internal controls in the Company's financial reporting process prevented Force Protection from properly understanding its actual financial and operational performance.

(f) Defendants had caused the Company to falsely report at least its third quarter 2007 financial results.

30. As a result of defendants' false statements, Force Protection's stock price traded at inflated levels during the Class Period. The defendants profited handsomely from their misstatements—they sold $87.4 million worth of Force Protection stock. Common investors, however, were not nearly so fortunate.

## JURISDICTION AND VENUE

31. This Court has jurisdiction under section 27 of the Exchange Act. The claims asserted in this complaint arise under sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5.

32. Venue is proper in this Court, because the Company is headquartered here, many of the misstatements were made in this District, and this complaint meets the venue requirements of section 27 of the Exchange Act.

## PARTIES

33. Shannon W. Cope, a plaintiff and putative class representative, purchased Force Protection common stock as described in the certification attached to this complaint, and suffered damages because of the defendants' misconduct.

34.     Bonnie Hettinger, a plaintiff and putative class representative, purchased Force Protection common stock as described in the certification attached to this complaint, and suffered damages because of the defendants' misconduct.

35.     Cope and Hettinger are referred to, collectively, as "the Plaintiffs."

36.     Defendant Force Protection is the company that misstated its true financial health, missed important delivery deadlines, and was not competitive in the governmental contract competitive bidding environment.  It produces vehicles used to protect military personnel in combat operations from explosions and improvised explosive devices.

37.     Defendant Frank Kavanaugh was, at relevant times, a director and Chairman of the Board of the Company until he abruptly resigned on June 21, 2007.  During the Class Period, Kavanaugh was responsible for the Company's false financial statements and reaped proceeds of over $64.3 million by selling 4.9 million shares of his Force Protection stock.  Defendant Kavanaugh signed the Form 10-K the Company filed for 2006.

38.     Defendant Gordon R. McGilton was, at relevant times, CEO and a director of the Company until he resigned on January 31, 2008.  During the Class Period, McGilton was responsible for the Company's false financial statements and reaped proceeds of over $23 million by selling 1.4 million shares of his Force Protection stock.

39.     Defendant Michael Moody is, and at all relevant times was, President of the Company.  Defendant Moody was appointed CEO and Chairman of the Board of Force Protection on February 29, 2008.

40.     Defendant Michael S. Durski was CFO of the Company from January 2007 until February 29, 2008.  Durski's departure from Force Protection was directly tied to the revelation that the Company had failed to adequately account for its finances.

41.     Defendant Raymond W. Pollard was Chief Operating Officer of the Company until March 3, 2008.  Pollard's departure from Force Protection was directly tied to the revelation that the Company had failed to adequately account for its finances.

42.    Kavanaugh, McGilton, Moody, Durski, and Pollard (the Individual Defendants), possessed the power and authority to control the contents of the Company's quarterly reports, because of their positions of authority within Force Protection.  They also had control over the press releases the Company released; its presentations to analysts, money and portfolio managers and institutional investors; and all other communications with information providers and the investing public.  They were provided with copies of the Company's reports and the press releases alleged to be misleading either before they were issued, or within a short time after they were issued.  The Individual Defendants could have either prevented the communication of misleading information or cured the misleading information after it was released.

43.    Because of their positions within Force Protection and their access to very important information that was available to the Individual Defendants, but not to the investing public, they knew that the adverse facts specified in this complaint were being concealed from the investing public.  The Individual Defendants knew that the positive public statements that the Company was making were materially false and misleading when those statements were made.  The Individual Defendants are liable for the false statements that are described in this complaint.

44.    The Defendants are liable for making false statements and/or failing to disclose adverse facts they knew about Force Protection.  Their fraudulent scheme and course of business operated as a fraud or deceit on purchasers of Force Protection common stock and was a success, because it artificially inflated the Company's stock price through deceiving the investing public; misled the investing public regarding the substantive performance and financial health of the Company; allowed both Kavanaugh and McGilton to sell $87.4 million of their personal Force Protection stock at artificially high prices, resulting in a windfall to them; and caused the Plaintiffs and other members of the Class to buy Force Protection common stock at artificially high prices.

## CLASS ACTION ALLEGATIONS

45.    The Plaintiffs bring this case as a class action under Federal Rule of Civil Procedure 23 on their behalf and on behalf of all persons who purchased or otherwise acquired Force Protection common stock during the Class Period.  Excluded from the Class are defendants.

46. The members of the Class are numerous, and joinder of all class members is impracticable. Force Protection has more than 68 million shares of stock outstanding, and those 68 million shares likely are owned by thousands of investors.

47. This case presents common questions of both fact and law that would be most efficiently resolved through a certified class action. Among those common questions are the following:

     a. whether the defendants violated Exchange Act;

     b. whether the Individual Defendants are liable for their conduct as control persons under section 20 of the Exchange Act;

     c. whether defendants misrepresented and/or omitted material facts;

     d. whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

     e. whether defendants knew or deliberately disregarded that their statements were false and misleading;

     f. whether the price of Force Protection common stock was artificially inflated; and

     g. the extent of damage sustained by Class members and the appropriate measure of damages.

48. The Plaintiffs' claims are typical of those that the rest of the Class will bring, because all Class Members endured similar harm as a result of the defendants' wrongful conduct.

49. The Plaintiffs will protect the interests of the Class adequately, and they have retained appropriate counsel who are ready, willing, and able to prosecute this large-scale securities class action.

50. The Plaintiffs have no interests that are adverse to the rest of the Class.

51. Certification of this case as a class action would serve judicial economy, and result in the most prompt, effective, and just resolutions of the allegations in this complaint.

## FACTUAL ALLEGATIONS

52.    As stated earlier, Force Protection is a defense contractor that manufactures blast-protected armored vehicles that are purchased almost exclusively by military procurement agents.  There is not a strong market for the goods sold by Force Protection outside of contracts with sovereign nations.

53.    Before and during the Class Period, the defendants made statements that were incorrect regarding the business prospects, performance, and financial health of the Company.  Those statements resulted in harm to the Plaintiffs and the rest of the Class.

54.    Force Protection repeatedly certified to the SEC that it had complied with all relevant laws.  On August 14, 2006, Force Protection filed its Form 10-Q for the second quarter of 2006.  McGilton made the following certification in that 10-Q:

> I, Gordon McGilton, certify that:
>
> 1. I have reviewed this quarterly report of Force Protection, Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the small business issuer as of, and for, the periods presented in this report;
>
> 4. The small business issuer's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the small business issuer and have:
>
> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the small business issuer, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Evaluated the effectiveness of the small business issuer's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c) Disclosed in this report any change in the small business issuer's internal control over financial reporting that occurred during the small business issuer's most recent fiscal quarter (the small business issuer's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the small business issuer's internal control over financial reporting; and

5. The small business issuer's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the small business issuer's auditors and the audit committee of the small business issuer's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the small business issuer's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the small business issuer's internal control over financial reporting.

55.    R. Scott Ervin, who was the interim CFO of the Company, signed a nearly identical certification to McGilton's that was included in that Form 10-Q.

56.    On August 15, 2006, the Company reported its second quarter 2006 results, and stated as follows in its earnings release:

Force Protection, Inc. today announced record sales of $56,074,537 as part of its second quarter results for the three month period ended June 30, 2006. The company also recorded its highest quarterly gross profit to date of $10,156,786, and a net profit of $1,234,015 for the same period.

"Our second quarter results reflect the increasing demand for our life-saving armored vehicles, and that we remain on track in FY06

14

in meeting that demand," said CEO Gordon McGilton. "The hard work performed by our employees to improve operations and increase production continues to pay benefits."

Force Protection's net cash flow from operations for the six-month period ended June 30, 2006 was $4.0 million, compared with a loss from operations of $4.8 million during the same period in 2005. The company was also profitable for the first half of 2006, booking a year-to-date net profit of $568,382.

"While we are extremely pleased to report these positive earnings, we have not lost sight of our long-term plan," said McGilton. "Force Protection's overarching objective is to become a high-volume supplier of the best-protected vehicles available in the world."

Force Protection's dramatic growth from a small start-up firm to a mainstream manufacturer with a workforce of more than 550 has been driven by the demand of U.S. combat engineers and explosive ordnance disposal teams for the Buffalo and Cougar mine-protected vehicles, which they credit with saving lives since 2003. A recent contract from the British Ministry of Defense for protected vehicles to support infantry patrols marks an additional expansion of the company to the international defense industry.

57.    On November 14, 2006, the Company issued a press release entitled "Force Protection, Inc. Announces Continued Profitability for Third Quarter."  That release continued the bullish reports from Force Protection:

Force Protection, Inc. today announced sales of $42,160,858 as part of its third quarter results for the three-month period ended September 30, 2006. The company recorded a quarterly gross profit of $7,918,508, and a net profit of $602,698 for the same period. Force Protection has realized year-to-date net profits of $1,171,080, generating year-to-date earnings of $0.03 per share.

"This is Force Protection's third consecutive month of operating profitability," said Vice President of Finance Richard Hamilton. "Sales for the quarter bring our 2006 cumulative year-to-date revenue total to $133,037,980, reflecting a dramatic increase from our 2005 full-year results."

Force Protection was recently named South Carolina's Fastest-Growing Company in 2006. The award, based on gross revenues and employment, recognizes the top 25 companies that have

contributed to the state's economy. Since their initial deployment to Iraq and Afghanistan in 2003, no fatalities have occurred in a Force Protection vehicle.

"The third quarter was a period of internal growth for the company," said CEO Gordon McGilton. "We added two new vehicle production lines, improved efficiency within the facilities, and continued our workforce expansion program. The focus on these activities caused an anticipated short-swing dip in our third quarter revenue compared with our second quarter results, but it has positioned us to secure new contracts and handle the increased workload flowing from them."

58.    On November 14, 2006, Force Protection filed its Form 10-Q for the third quarter of 2006, which included the same financial results previously reported.  The Form 10-Q also contained virtually identical certifications by McGilton and Ervin as Force Protection's Form 10-Q for the second quarter of 2006.

59.    On December 15, 2006, the Company issued a press release entitled "Force Protection, Inc. Announces Review of Financial Statements; Restatement."  The release delivered the first bit of bad news associated with internal controls at Force Protection:, but did not reveal the extent to which Force Protection was plagued with poor internal controls:

Force Protection, Inc. (the "Company") announced today that management of the Company has completed a review of its prior financial filings. In that review, the Company has discovered items which require restatement. The Company will restate the financial statements for the fiscal years ended December 31, 2003 and 2004. The Company did not give a timetable as to when the restatements would be completed.

The items identified by the Company relate to the valuation method used to account for certain equity issuances which did not properly include a full analysis of the embedded conversion feature associated with such issuances as required under EITF 98-5, Accounting for Convertible Securities with Beneficial Conversion Features or Contingently adjustable Conversion Ratios, or which were otherwise incorrectly valued. As a result, a number of shares of the Company's stock issued as compensation to certain executives and other third parties and recorded as general and administrative compensation expense appear to have been valued at less than fair value.

> The Company believes this issue is limited to a small number of equity issuances made during 2003 and 2004, with a total combined value of not more than $3.75 million. The Company is undertaking a careful review of its equity transactions and related financial statements in light of all applicable accounting guidelines and currently expects that it will need to restate its financial results for the years 2003 and 2004 to include additional general and administrative compensation expenses for such periods. The Company expects that such restatement will result in a corresponding additional cumulative net loss of approximately $3.75 million for these periods. The Company believes that the restatement will not materially impact its 2006 financial results.

60.    On December 20, 2006, Force Protection sold 13 million shares of common stock to institutional investors at $11.75 per share.  That sale resulted in $146.6 million worth of net proceeds to the Company.

61.    On March 6, 2007, the Company issued a press release entitled "Force Protection, Inc. Announces Review of Financial Statements," which further discussed some restatements but maintained a positive outlook for the Company:

> Force Protection, Inc. (the "Company") announced today that management of the Company has completed a review of its prior financial filings. In that review, the Company has discovered items which require restatement. The Company will restate the financial statements for the fiscal year ended December 31, 2005. The Company did not give a timetable as to when the restatement would be completed.

> The Company believes the areas requiring restatement relate to its accounting for preferred stock and warrants issued to investors. The Company has reviewed applicable Financial Accounting Standards Board Statements and Emerging Issue Task Force Statements (EITFs) including EITF 00-19, Accounting for Derivative Financial Instruments Indexed to, and Potentially Settled in, a Company's Own Stocks. As a result, the Company believes that the accounting method it applied to the warrants of its Series D Preferred Stock equity issuance did not include a complete analysis of the mandatory redeemable feature as required.

> The Company believes that it will need to restate its financial results for the year ended December 31, 2005 to reflect a realized gain on derivative instruments in the range of $2 to $4 million due

to changes in the "fair value" of the warrants, however, this adjustment is still an estimate and it may be higher or lower once the Company completes the final accounting and independent audit of its conclusions. ***The Company believes that the restatement will not materially impact its 2006 financial results.*** The Company's management and audit committee have discussed the subject matter giving rise to this conclusion with Jaspers + Hall, PC, its independent accounting firm for the fiscal year ended December 31, 2005.

62.     On March 16, 2007, the Company issued a press release entitled "Force Protection Reports Record Results in 2006."   In that release, McGilton and the Company continued to maintain their bullish public persona, which was contrary to the facts unfolding on the ground:

> Force Protection, Inc.—the leading protective vehicle manufacturer, today announced results for the fourth quarter and year ended December 31, 2006.
>
> For the year ended December 31, 2006, the Company's net sales totaled $196.0 million. Net income was $18.2 million or $0.39 per diluted share.
>
> In the fourth quarter of 2006, the Company's net sales totaled $62.9 million. Net income was $17.0 million or $0.32 per diluted share during the fourth quarter of 2006.
>
> Gordon McGilton, Chief Executive Officer of Force Protection, said, "2006 has been a milestone year in the history of Force Protection. It is the first year of profitability and a year of tremendous growth. With the completion of a $152.75 million equity offering, the appointment of several independent Board members, and the NASDAQ Stock Market listing, the Company is able to handle the rapid expansion and accommodate the continuing demand of our vehicles. We continue to focus on expediting deliveries through the efficient use of our production facilities and the collaboration of other defense industry leaders with whom we have partnered. Our mission is to produce vehicles that protect and save lives and we are committed to ensuring that those vehicles are available to protect our troops in a timely manner."

63.     On March 16, 2007, the Company filed its Form 10-K for fiscal 2006, which included results for the fourth quarter of 2006, and included the same financial results as

previously reported. The Form 10-K also contained virtually identical certifications by McGilton and Durski as Force Protection's Form 10-Q for the second quarter of 2006.

64.    On May 15, 2007, the Company issued a press release entitled "Force Protection Reports Record First Quarter 2007 Financial Results." The release again touted the positive outlook for Force Protection:

> Force Protection, Inc., the leading armored vehicle manufacturer, today announced results for the first quarter ended March 31, 2007.
>
> Net sales for the first quarter ended March 31, 2007 totaled $100.2 million, an increase of 187.6% compared with $34.8 million reported during the same period in the prior year. This growth is primarily due to a significant increase in vehicle production and deliveries in several blast protected vehicle programs, reflecting contract awards received in the latter half of 2006. These include contracts with the U.S. Marine Corps to supply Cougar Joint Explosive Ordnance Disposal Rapid Response Vehicles (JERRV), Buffalo Mine Protected Clearance Vehicles, and a contract with the British Ministry of Defense for Mastiff Protected Patrol Vehicles or Mastiff PPV.
>
> Force Protection recorded a gross profit for the first quarter 2007 of $21.8 million, an operating profit of $2.5 million and negative cash flows from operations of $27.2 million. Net income for the first quarter of 2007 was $2.5 million or $0.04 per diluted share, compared with a net loss of $665,633 or $(0.03) per diluted share for the same period last year.
>
> Gordon McGilton, Chief Executive Officer of Force Protection, said, "We are very pleased with our results for the first quarter. The Company is now starting to see the tangible benefits of the contract awards we received in 2006 and already, in the first quarter alone we have achieved net sales that equal nearly half of our total 2006year net sales performance. We believe our outlook for the rest of 2007 is even brighter, given recent contract awards and the delivery orders we have already received from the U.S. Marine Corps. We intend to continue to expand our operations and remain focused on expediting deliveries through increased efficiencies at our production facilities."

65.    On May 15, 2007, the Company filed its Form 10-Q for first quarter of 2007. That filing included the same financial results as previously reported and contained virtually

identical certifications by McGilton and Durski as in Force Protection's Form 10-Q for the second quarter of 2006.

66.     On June 11, 2007, the Company filed an amended Form 10-K for the 2006 fiscal year. Despite providing restated financial results for the period, the Form 10-K contained virtually identical certifications by McGilton and Durski as in Force Protection's Form 10-Q for the second quarter of 2006.

67.     On June 15, 2007, the Company announced that Kavanaugh would be resigning from the Company effective June 21, 2007.

68.     On June 27, 2007, the Company filed an amended 10-K for the 2005 fiscal year. Despite providing restated financial results, the Form 10-K also contained virtually identical certifications by McGilton and Durski as Force Protection's Form 10-Q for the second quarter of 2006 contained.

69.     On June 27, 2007, the IG of the United States Department of Defense issued its report entitled "Procurement Policy for Armored Vehicles." That report contained startling revelations regarding the ability of Force Protection to meet its contract requirements, and its future prospects for participating in competitively-bid contracts:

> WHO SHOULD READ THIS REPORT AND WHY? Army and the Marine Corps acquisition and contracting personnel should read this report because it concerns armored vehicle procurement decisions that affect Global War on Terrorism mission requirements.
>
> * * *
>
> **Procurement History for Armored Vehicles.** DoD awarded 15 contracts, valued at $2.2 billion, to Force Protection, Inc., and Armor Holdings, Inc., for armored vehicles and armor kits. Specifically, DoD awarded 11 sole-source contracts, valued at $416.7 million, to Force Protection, Inc., for armored vehicles . . . . DoD contracting and program officials stated that Force Protection, Inc. [was one of only two] sources capable of producing the armored vehicles and meeting the urgent delivery schedules required to support the Global War on Terrorism.

RESULTS. The Marine Corps Systems Command awarded sole-source contracts to Force Protection, Inc., for the Joint Explosive Ordnance Disposal Rapid Response Vehicle even though Marine Corps Systems Command officials knew other sources were available for competition. In addition, TACOM Life Cycle Management Command and Marine Corps Systems Command officials did not adequately justify the commercial nature of three commercial contracts with Force Protection, Inc., for the Cougar and the Buffalo Mine Protected Clearance Vehicle. *As a result, the Marine Corps Systems Command continued to award contracts for armored vehicles to Force Protection, Inc., even though Force Protection, Inc., did not perform as a responsible contractor and repeatedly failed to meet contractual delivery schedules for getting vehicles to the theater.* In addition, TACOM Life Cycle Management Command and Marine Corps Systems Command decisions to award commercial contracts to Force Protection, Inc., may have limited the Government's ability to ensure it paid fair and reasonable prices for the contracts. The Marine Corps Systems Command should continue to calculate and assess any additional liquidated damages for late delivery of vehicles on contract M67854-05- D-5091 and compete future contracts for the Joint Explosive Ordnance Disposal Rapid Response Vehicle. Additionally, TACOM Life Cycle Management Command contracting officials should procure future Buffalo Mine Protected Clearance Vehicles and Marine Corps Systems Command contracting officials should procure future Mine Resistant Ambush Protected vehicles under FAR Part 15 with negotiated prices based on certified cost and pricing data, and include and enforce a liquidated damages clause on future contracts with Force Protection, Inc.

* * *

MANAGEMENT COMMENTS AND AUDIT RESPONSE. The Acting Chief of Staff, TACOM Life Cycle Management Command, and the Commandant of the Marine Corps commented on finding A and concurred with the recommendations. The comments were responsive and no additional comments are required. A discussion of the management comments is in the Finding section of the report, and the complete text of the comments is in the Management Comments section.

70.    On July 12, 2007, The Street.com issued an article entitled "Force Protection Shakes Off Questions," which stated in part:

Force Protection may have run into a bit of a landmine.

21

For years, the Ladson, S.C., defense contractor monopolized the market for blast-resistant vehicles by boasting superior products and rapid delivery rates. But a damaging government report, published late last month by the Office of the Inspector General, raises questions about both claims.

For starters, the OIG report suggests that another company offered a suitable vehicle – with a faster delivery schedule – even though the military singled out Force Protection as the only viable contender when awarding the company big contracts without seeking competitive bids. Moreover, the report claims that Force Protection repeatedly missed delivery deadlines – despite an expansion project financed by the government – and escaped mandated penal-ties because of threats to the company's cash flow and overall financial condition.

The government's financial assistance supposedly came with strings attached. With 98% of its orders missing dead-lines by early 2006, the report estimates, Force Protection faced up to $6.6 million in liquidated damages. Force Protection would have struggled to cover those extra costs, since – even without them – its auditors raised concerns about the company's ability to survive just a few months later. Losing the military as its only customer might have killed the company altogether.

Instead, Force Protection not only dodged expensive fines but also went on to score additional vehicle contracts and emerge as the leader in a field now crowded with larger competitors. Force Protection, through a joint-venture with heavyweight defense contractor General Dynamics, currently ranks as the biggest winner under the military's multibillion-dollar Mine-Resistant Ambush-Protected vehicle program.

Force Protection did not immediately respond to a telephone message left by TheStreet.com Thursday morning. However, the company seemed almost apologetic when discussing the situation with Bloomberg News the previous afternoon.

"We have continually given the government our most aggressive, best delivery schedule," Michael Aldrich, Force Protection's vice president of government relations, told Bloomberg News on Wednesday. "With increasing numbers and a more complex flow of materials, it is inevitable that our most aggressive schedule will be disrupted from time to time by lack of critical materials".

However, Aldrich conceded, "because we've been late, we need to provide compensation to the government, and we are negotiating on that."

Meanwhile, Force Protection has failed to monopolize MRAP – as many analysts expected – after the company missed its early deadlines and the military started welcoming other bidders. Moreover, the company faces mounting competition and calls for sturdier vehicles as it seeks to maintain its leadership position under a greatly expanded MRAP II program.

Still, until now, the government has complained little about Force Production's delivery delays. Indeed, in a February article published by the Marine Corps Times, Marine spokesman Bill Johnson-Miles singled out Force Protection as one of two companies that "have shown their reliability to produce vehicles, meaning they meet Marine Corps Systems Command survivability, production number and delivery timeline requirements."

At the same time, Force Protection itself has been boasting about "record" production rates and the company's ability to meet – and even exceed – tight deadlines. But David Phillips, a financial expert known as the "10-Q Detective," has always felt skeptical about Force Protection's claims.

"The company was so concerned with living up to the hype that it kept booking contract after contract," says Phil-lips, who has no position in Force Protection's stock himself. "But I never felt that management had the skill set – or that the company had the manufacturing capacity – to follow through on that volume."

Force Protection insiders haven't exactly displayed total confidence in the company, either. Notably, even as Force Protection touted its achievements, insiders were busy dumping loads of company shares. Thanks to stock sales, in fact, Force Protection's longtime chairman recently retired from his post as a multimillionaire.

Bulls like to argue that Force Protection executives sold their stock under prearranged plans. However, bears counter that those executives are free to cancel future sales – and might want to if they expected the stock to climb – any time they wish.

To be fair, ordinary shareholders have gotten rich on Force Protection's meteoric rise as well. But Phillips, for one, worries

that investors could pay a steep price for their trust in company management in the end.

*"The stock went from $3 to $30 on the expectation that the company was delivering the goods," he says. "But to be honest – as the Pentagon pointed out – the company did not deliver on its promises."*

Melissa Davis, *Force Protection Shakes Off Questions*, TheStreet.com *at* http://www.thestreet.com/story/10367641/1/force-protection-shakes-off-questions.html (July 12, 2007) (last visited April 3, 2008) (emphasis added).

71.    The same day that article appeared, the Company filed a second amended Form 10-K for the 2006 fiscal year.  Despite providing restated financial results for that period, the 10-K also contained virtually identical certifications by McGilton and Durski as were contained in the Company's Form 10-Q for the second quarter of 2006.

72.    On July 13, 2007—a day after the article appeared on TheStreet.com—Force Protection issued a statement regarding the June 27, 2007 IG report.  The Company's statement reflected positive internal news, specifically referred to its products as the "gold standard" of armored vehicles, and attributed the issues spotted by the Inspector General's report to "minor glitches" in the supply chain:

"Like all Americans, we are disappointed with some of the findings in the Inspector General's report," said Force Protection CEO Gordon McGilton. "From its beginnings, Force Protection's objective has been to provide the finest lifesaving vehicles in the world. We have consistently operated under urgent operational needs and have sought diligently to meet government requirements under extremely short timeframes. However, we believe that recent press coverage on the report has missed some key findings. As stated clearly on page 26, 'the Cougars and the JERRVs proved to have significant and operational value to our warfighters on the field.' The report also states that, 'We reviewed documentation from users and classified data on vehicle performance and learned that the vehicles performed well and saved lives.'

"When past delivery delays have occurred it has been representative that even a minor glitch in the supply chain can push things back under such tight parameters," McGilton said. "Enormous progress has been made in fielding this proven,

battlefield solution years ahead of traditional defense schedules. Tens of thousands of our servicemen and women are alive and have reunited with their families and friends at home because of the protection provided by our vehicles. Force Protection will continue to work with the Department of Defense to produce and improve upon the best blast and ballistic protection technology in the world."

Force Protection's vehicles have become the gold standard in troop protection against IEDs, roadside bombs, and land mines. The vehicles have logged more than three million hours of heavy combat operations and withstood thou-sands of blast attacks in Iraq and Afghanistan since 2003.

Force Protection is a leading ballistics research and manufacturing enterprise, specializing in the development and production of highly reinforced armored personnel carriers that are designed to save soldiers' lives by shielding them from the deadly effects of roadside bombs, or IEDs, which have become a leading killer of U.S. troops in Iraq. The trucks' unique, V-shaped hull is designed to deflect the force of IED blasts away from the vehicle, keeping soldiers in-side safe and alive, and have become the proven response to an emerging global threat to U.S. troops. Its leading models include the 23 ton "Buffalo", a uniquely-designed mine clearance vehicle with a reinforced mechanical arm, and the family of "Cougar" vehicles, both of whose mine and ballistic protection capabilities are among the most advanced in the world.

73.    Less than one week later, on July 19, 2007, the Company filed an amended 10-Q for the first quarter of 2007.  Despite providing restated financial results for the period, the Form 10-Q also contained virtually identical certifications by McGilton and Durski as were produced with Force Protection's Form 10-Q for the second quarter of 2006.

74.    On August 9, 2007, the Company issued a press release entitled "Force Protection Reports Record Second Quarter and Six Month 2007 Financial Results."  The release contained further positive news regarding the Company's performance:

Force Protection, today announced results for its second quarter and six months ended June 30, 2007.

Net sales for the second quarter of 2007 rose 140% to $134.7 million, compared to net sales of $56.1 million for the second quarter of 2006. Net sales for the six month period ended June 30,

2007 were $234.9 million, compared to $90.9 million for the first six months of 2006, a 158% increase. The primary reason for the increase in sales was due to the improving production capability leading to increased deliveries and sales of its Cougar and Buffalo vehicles.

For the second quarter gross profit was $32.8 million, or 24.3% of net sales, compared to a gross profit of $10.2 million, or 18.1% of net sales for the second quarter of 2006. As a percentage of net sales gross margin increased 6.2% over second quarter 2006. Gross profit for the first six months of 2007 was $55.3 million, or 23.5% of net sales, compared to a gross profit of $16.8 million, or 18.5% of net sales for the first six months of 2006. As a percentage of net sales gross margin increased 5.0% for the first six months of 2007, compared to the same period last year. The gross profit increase for the second quarter and six month period was primarily due to improved material and labor costs and the Company's increased ability to leverage fixed costs as it continues to expand its production capability.

Research and development (R&D) expenses increased 416% to $3.3 million, compared to $641,215 for second quarter 2006. For the first six months of 2007, R&D rose 524% to $8.1 million, compared to $1.3 million for the first six months of 2006 primarily due to continued development of the Cheetah vehicle. The company previously announced the acquisition of an additional facility for the manufacture of current and future products including the Cheetah and expects the production capacity to be approximately 2,000 Cheetah vehicles in 2008 as previously stated.

Expansion efforts continue and are on track to provide increased capacity at our facilities in Ladson, SC, Roxboro, NC and the various facilities within our enterprise which will enable us to meet previously stated production capacity within our operations.

The Company recorded an operating profit of $13.9 million for the quarter, compared to an operating profit of $1.8 million for the second quarter of 2006. Operating profit was $16.5 million for the first half of 2007, compared to an operating profit of $1.8 million for the first half of 2006.

Income after taxes for the second quarter was $9.6 million, compared to income after taxes of $973,024 for the same quarter last year, a 889% increase. For the six month period ended June 30, 2007, the Company reported income after taxes of $12.1

million, compared to income after taxes of $205,575 for the first six months of 2006.

Net income for the quarter rose 2,170% to $9.6 million, or $0.14 per diluted share, compared to net income of $424,047 or $0.01 per diluted share for the same period last year. Net income for the six month period was $12.1 million, or $0.18 per diluted share, compared to net loss of $(989,267) or $(0.03) per diluted share for the same period last year. The Company incurred a $1.7 million charge for the late registration of the private placement during the second quarter 2007, or $0.025 per diluted share. Excluding this charge, EPS would have been $0.17 per share. As earlier announced, the S-3 filing was declared effective on July 26, 2007.

Gordon McGilton, Chief Executive Officer of Force Protection commented, "We are most pleased with our results for the second quarter having realized significant increases in net sales, net income and gross profit. At the same time, we produced 229 vehicles in the second quarter compared to 285 vehicles in all of 2006."

"We were also pleased to have signed several additional contracts during the quarter in connection with our joint venture with General Dynamics. During the quarter, we announced that we had been awarded contracts totaling $711 million to produce 1,455 vehicles for the U.S Marine Corps' Mine Resistant Ambush Protected (MRAP) vehicle program.

As previously announced, we received our first Canadian contract for approximately $8.9 million to produce five Buffalo and five Cougar mine-protected vehicles for the Canadian Expeditionary Force Command (CEFCOM). We recently delivered the first of these vehicles to the Canadian forces."

Subsequent Events

On July 20, 2007, we entered into an Agreement with Wachovia Bank for a revolving credit facility of $50,000,000. We entered into this agreement to assure continued flow of cash while administrative contractual payment issues are worked out with government payment offices on recently established MRAP programs.

On August 1st, 2007, the Company announced a contract for approximately $5.3 million for continued work under the Iraqi Light Armored Vehicle (ILAV) program for new ILAV vehicles

and equipment to include 22 new vehicles and more than 40 articulating interrogating arms.

Mr. McGilton concluded, "The progress that we have made to date in 2007 positions us for a successful year. As noted, we are continuing to see strong demand for our vehicles. We are also realizing the benefits of improved materials and labor costs and a reduction in our fixed costs. Most importantly we remain committed to our mission to make vehicles that protect and save lives by making sure that those vehicles are available to our troops in a timely manner."

75.    On August 9, 2007, the Company filed its Form 10-Q for the second quarter of 2007, which included the same financial results it previously had reported. The Form 10-Q also contained virtually identical certifications by McGilton and Durski as were included in Force Protection's original Form 10-Q for the second quarter of 2006.

76.    On October 15, 2007, the Company filed newly amended 10-Ks for the 2005 and 2006 fiscal years. Those restatements specifically were caused by the Company's management reexamining the internal controls that the Company had in place. After reexamining its financial reporting controls, the Company's management determined that there were material weaknesses that underlied the 2005 and 2006 annual reports.

77.    The narrative statement included with the 2006 amended 10-K explained the rationale behind the restatement as follows:

[O]ur management identified the following material weaknesses in the Company's internal control over financial reporting as of December 31, 2006:

*Our financial and accounting organization was not adequate to support our financial accounting and reporting needs. Specifically, we did not maintain a sufficient complement of personnel with an appropriate level of accounting knowledge, experience with the Company and training in the application of GAAP commensurate with our financial reporting requirements. The lack of a sufficient complement of personnel with an appropriate level of accounting knowledge, experience with our Company and training contributed to the control deficiencies noted below.*

(1) We did not maintain effective policies and procedures related to the accounting for specific equity issuances, including accounting for stock-based compensation in accordance with Statement of Financial Accounting Standard ("SFAS") No. 123, Share-Based Payment, and accounting for convertible and redeemable preferred stock and warrants. This deficiency resulted in errors in the Company's accounting and disclosures for these equity issuances and related earnings per share calculations.

(2) We did not maintain effective controls to ensure the accuracy of disclosures in our financial statements and classification of certain financial transactions in the financial statements. Specifically, we failed to classify the allowance for contractual adjustments as a reduction in receivables and had incorrect or inadequate disclosures in financial statement disclosures related to the nonrecurring warranty, statement of shareholders' equity, deferred tax assets, liabilities and related income tax expense, contingency losses, discontinued operations, receivables and factoring accounts, debt and the statement of cash flows in our financial statements.

The control deficiency described above in (1) resulted in the restatement of our annual consolidated financial statements for 2005, 2004, and 2003. The control deficiency described in (2) required amendment of our annual financial statements for the years 2005, 2004 and 2003 which are included in our amended 2005 Form 10K filing. The control deficiency related to earnings per share in (1) resulted in restatement of the 2006 earnings per share calculations in the annual financial statements in the amended 2006 Form 10-K. Additionally, these control deficiencies could result in a misstatement in our annual or interim consolidated financial statements that would not be prevented or detected. Management has determined that each of the control deficiencies described above constitutes a material weakness.

These deficiencies result in more than a remote likelihood that a material misstatement of the Company's annual or interim financial statements would not be prevented or detected. Management has taken or plans to take steps to improve our internal control over financial reporting . . . .

As a result of the material weaknesses, our management has concluded that our internal control over financial reporting was not effective as of December 31, 2006.

78.    On November 14, 2007, the Company issued a press release entitled "Force Protection Reports Record Third Quarter and Nine Month 2007 Financial Results."  The release contained more positive news from the upper management of the Company:

> Force Protection, Inc. today announced results for its third quarter and nine months ended September 30, 2007.
>
> The Company reported net sales for the third quarter of $206.3 million, a 389% increase, compared with net sales of $42.2 million for the third quarter of 2006. Net sales for the first nine months of 2007 rose 232% to $441.2 million, compared with net sales of $133.0 million for the first nine months of 2006. The sales increase for both periods was a result of increased deliveries of Force Protection's Cougar and Buffalo vehicles. This includes increased production of vehicles by our joint venture partner General Dynamics Land Systems (GDLS), whose sales of Cougar vehicles under the mine resistant ambush protected (MRAP) program are included in our net sales.
>
> The Company's third quarter 2007 results included approximately $33.3 million of net sales attributed to vehicles produced by GDLS under the December 15, 2006 joint venture requiring the company to award fifty percent (50%) of the MRAP Cougar vehicle production work to GDLS. Pursuant to the joint venture and a subcontract issued in support thereof, GDLS charges the Company an amount per vehicle that is equal to the revenue the Company receives from the Government, which increased the Company's cost of sales for the third quarter of 2007 by a corresponding $33.3 million. Including the revenues as cost of vehicles manufactured by GDLS results in a decreased gross margin percentage, but has no impact on our absolute dollars of gross margin. Until such time as the MRAP contract is novated to the joint venture, vehicles produced by GDLS will be reported by the Company in sales and cost of sales.
>
> Net earnings available to common shareholders for the third quarter of 2007 increased to $11.4 million, or $0.16 per diluted share, compared with net income of $239,943, or $0.0 per diluted share for the third quarter of last year. Net earnings available to common shareholders for the nine month period of 2007 was $23.5 million, or $0.34 per diluted share, compared with a net loss of $(749,324), or $(0.02) per diluted share for the same period last year.

Gross profit for the third quarter of 2007 was $40.6 million, or 19.7% of net sales, compared with a gross profit of $7.9 million, or 18.8% of net sales for the third quarter of 2006. For the first nine months of 2007, the Company reported gross profit of $95.9 million, or 21.7% of net sales, compared with a gross profit of $24.7 million, or 18.6% for the prior year period. The gross profit increase for the third quarter and nine months was primarily due to improved material and labor costs and the Company's increased ability to leverage fixed costs as it continues to expand production.

The Company recorded an operating profit of $18.1 million for the third quarter 2007, compared with an operating profit of $657,372 for last year's third quarter. Operating profit was $34.6 million for the nine month period ended September 30, 2007, compared with $2.4 million for the first nine months of 2006.

Cash flow for the first nine months of 2007 decreased by $84.0 million, compared with an increase of $25.5 million for the same nine month period in 2006. The 2007 decrease is primarily due to increased working capital and approximately $44 million in capital expenditures to support higher production volumes.

Gordon McGilton, Chief Executive Officer commented, "We are most pleased with the results for our third quarter and nine month periods, where we once again posted strong improvement in net sales, net income and gross profit. During the quarter we, together with our partners, produced 374 vehicles, compared with 58 vehicles for the same quarter last year."

"During the quarter we received a follow-on order totaling approximately $69 million from the U.S. Marine Corps for an additional 125 Cougar Category I and II vehicles for the MRAP program. The vehicles due under this order, twenty-five Category I, plus 100 Category II MRAPs are planned to be delivered by the end of 2007. Approximately 50% of the work under this order will be performed by GDLS."

Further, Mr. McGilton noted, "The Company continues to focus time and resources on managing the complexities of exponential growth which the Company has experienced. We are continuing to balance this successful growth with the maturation of our Business Operating System."

79.     On November 13, 2007, the Company filed its Form 10-Q for the third quarter of 2007. That report contained the same material financial information that the Company

previously had reported. That Form 10-Q also revealed that its internal control problems and material weaknesses were persistent.

80. In its 10-Q for the third quarter of 2007, Force Protection discussed its continuing financial reporting control issues as follows:

> Our management concluded so, in part, because (1) we did not maintain effective policies and procedures related to the accounting for specific equity issuances, including accounting for stock-based compensation in accordance with statement of Financial Accounting Standard ("SFAS") No. 123, Share-Based Payment, and accounting for convertible and redeemable preferred stock and warrants. This deficiency resulted in errors in the Company's accounting and disclosures for these equity issuances and related earnings per share calculations. (2) We did not maintain effective controls to ensure the accuracy of disclosures in our financial statements and classification of certain financial transactions in the financial statements.
>
> Specifically, we failed to classify the allowance for contractual adjustments as a reduction in receivables and had incorrect or inadequate disclosures in financial statement disclosures related to the non-recurring warranty, statement of shareholder's equity, deferred tax assets, liabilities and related income tax expense, deferred tax assets, liabilities and related income tax expense, contingency losses, discontinued operations, receivables and factoring accounts, debt and the statement of cash flows in our financial statements. (3) As discussed below in changes in internal controls, during the third quarter, we have also encountered turnover in financial reporting personnel and implementation issues of our new Enterprise Resource Planning ("ERP") computer system.
>
> * * *
>
> ***We believe the following changes in internal control over financial reporting (as defined in Rule 13a-15(f) of the Securities Exchange Act of Exchange) occurred during the third quarter of 2007 that materially affected or were, reasonably likely to materially affect our internal control over financial reporting.***
>
> Throughout 2007 and including the third quarter of 2007, we have dedicated a significant amount of time and resources to revise our internal controls to remediate the material weaknesses noted in our Annual Report on Form 10-K/A filed on October 15, 2007 and to enhance existing internal controls because of our significant

growth. We have added new in house legal counsel and key management in financial operations. Financial operations role is to focus on implementation of our new ERP system and its communication with all other significant business systems in the Company to ensure accurate financial reporting. We have also engaged a third party with expertise in internal controls to review documents and revise (as necessary) internal controls in an analysis of our key business operating systems.

In the third quarter of 2007, we implemented the inventory component of our ERP system and encountered issues in reconciliation of the physical inventory to the ERP system balances, requiring us to add additional manual controls to the process to correct these issues. This has delayed our implementation to the new ERP system. Also, we have encountered financial reporting personnel turnover in our financial reporting department which has delayed our quarterly reporting.

81.    The Company included the following language regarding its business risks on a going-forward basis, and acknowledged that its financial reporting controls could imperil its standing with the Government:

We are now a large business and may be precluded from entering into new contracts with the U.S. government unless our financial and accounting systems are improved sufficiently to meet government standards.

In order to enter into contracts with the U.S. military, a contractor's financial and accounting systems must generally meet the standards established by the Federal Acquisition Regulation ("FAR") and the Cost Accounting Standards ("CAS"). Compliance is usually reviewed by the Defense Contract Audit Agency ("DCAA"), an arm of the Department of Defense. Contractors who do not meet these standards generally are not eligible to win new contracts from the U.S. government.

* * *

We have been advised by the DCAA that our financial and accounting systems do not meet these requirements and, although we have been seeking to improve these systems, we have extensive work remaining in order to meet these standards. There can be no assurance as to when we will be able to meet these standards and, until we are able to do so, we may not be eligible for new contract awards by the U.S. military. Accordingly, any failure to meet these

33

standards will likely have a material adverse effect on our business.

***The DCAA has issued audit reports that have been highly critical of our finances and financial accounting system, that have questioned our ability to perform our government contracts, and that have questioned or disallowed significant proposed charges under some of our government contracts.***

U.S. government agencies, generally through the DCAA, routinely audit and investigate government contracts and government contractors' administrative processes and systems. The audits may review the costs we incur on our U.S. government contracts, including allocated indirect costs. The auditor may also review our compliance with applicable laws, government regulations, policies and standards and the adequacy of our internal control systems and policies, including our purchasing, property, estimating, compensation and management information systems. ***An adverse finding under a DCAA audit could result in the disallowance of our costs under a U.S. government contract, termination of U.S. government contracts, forfeiture of profits, suspension of payments, fines and suspension or prohibition from doing business with the U.S. government.*** Any costs found to be improperly allocated or otherwise improperly accounted for may not be paid or reimbursed, and any such costs previously paid or reimbursed may have to be refunded. We have recorded contract revenues based upon costs we expect to realize upon the final audit. However, we do not know the outcome of any future audits and adjustments and we may be required to reduce our revenues or profits upon completion and final negotiation of audits. If any audit uncovers improper or illegal activities, we may be subject to civil and criminal penalties and administrative sanctions, including termination of contracts, forfeiture of profits, suspension of payments, fines and suspension or prohibition from doing business with the U.S. government. In addition, responding to governmental audits may involve significant expense and divert management attention.

Moreover, if any of our administrative processes and systems are found not to comply with the applicable requirements, we may be subjected to increased government scrutiny or required to obtain additional governmental approvals that could delay or otherwise adversely affect our ability to compete for or perform contracts. Therefore, an unfavorable outcome to an audit by the DCAA or another government agency, could materially adversely affect our

competitive position and result in a substantial reduction of our revenues.

The DCAA has issued a number of audit reports concerning some of our contracts with the U.S. military. These reports have generally been highly critical of our finances and financial accounting systems. The DCAA has issued at least eight audit reports on our operations and contracts from May of 2004 through October of 2007. Some of these audit reports focused on proposals that we submitted or on our accounting systems. With respect to our proposal submissions, DCAA has repeatedly found that we did not submit our proposals in the correct format, that required data were missing, and that our proposal often lacked a proper basis for the costs submitted. In several of these audits, DCAA found that our accounting systems were inadequate, that our books failed to reconcile our general ledger with our cost summaries, that our systems did not track and properly account for direct and indirect costs, and that our systems are unable to segregate pre-production and production costs. In addition, DCAA audit reports in September 2006 and March 2007 considered us to have an unfavorable financial condition.

On January 25, 2006, the U.S. Army Tank-automotive and Armaments Command ("TACOM") audited the company to evaluate the adequacy of our ISO9001:2000 Quality System. The audit report identified critical areas of non-compliances and weaknesses in our quality system of control and provided various recommendations to address the deficiencies.

The Company is taking steps to improve its financial systems and to address the issues raised by the DCAA, TACOM and the Department of Defense Inspector General. For example, we are implementing a new financial system,. Although we indicated in our responses to certain audit responses that we planned to have the system operational by July 2007, it is still not fully operational. There can be no assurance as to whether we will be able to address these issues to the satisfaction of these agencies and, if we are unable to do so, we may be subject to price reductions, contract terminations, civil and criminal penalties, and other sanctions, including forfeitures of profits, suspension of payments, fines and suspension or debarment from doing business with the federal government as a prime or subcontractor. Accordingly, any failure to meet these standards could have a material adverse effect on our business.

***The Inspector General of the U.S. Department of Defense has issued a report questioning the award of sole source contracts to us and criticizing our performance.***

Because of the need to accelerate deliveries of blast resistant vehicles to U.S. forces in Iraq, certain of our contracts with the U.S. government were awarded to us on a "sole source" basis, meaning that our competitors were not permitted to bid for the contracts. In a report dated June 27, 2007, the Inspector General of the U.S. Department of Defense criticized the award of these contracts without competitive bidding, noting that there were other vehicles that could have competed with our Cougar vehicle, and recommended that future contracts for JERRV vehicles be awarded through a competitive bidding process. The report further indicated that the U.S. Marine Corps agreed that future contracts should be awarded through competitive bidding. To the extent that future U.S. military contracts for blast resistant vehicles are subjected to competitive bidding, it is likely that a number of other companies, most of which have substantially greater resources than we do, will bid for those contracts. Accordingly, the use of competitive bidding could have a material adverse effect on our ability to obtain future awards and contracts and on our operating results, cash flow, liquidity and prospects.

The report further indicates that we "did not perform as a responsible contractor and repeatedly failed to meet contractual delivery schedules." The criticism that we did not perform as a "responsible contractor" indicates that, in the view of the Inspector General of the Department of Defense, our performance under the contracts reviewed in the report did not meet the requirements of the federal regulations establishing "responsibility" as a prerequisite to qualifying for the award of U.S. government contracts. To the extent that Department of Defense officials in charge of the awarding of procurement contracts for our types of vehicles conclude that we are not "responsible," we would not be able to receive any such contracts.

In addition, in its description of the late delivery of vehicles by us, the report states that, of 233 Cougar, JERRV and Buffalo vehicles ordered by the Marine Corps under our contracts, 60% of the vehicles were delivered more than 30 days late under their original delivery schedules and that a substantial percentage were also more than 30 days late under revised delivery schedules. Moreover, in a contract relating to 122 JERRV vehicles, we agreed to pay liquidated damages of approximately $55,000 per vehicle (or a maximum of up to $6.7 million) in the event of late

36

deliveries. The contract schedules were bilaterally modified and any liquidated damages that were due for late deliveries were paid by us. The report recommends that the U.S. military include in future contracts and enforce a provision requiring us to pay liquidated damages for late deliveries, which also could require us to make substantial payments and adversely affect our liquidity and results of operations. None of our current active contracts provide for liquidated damages.

82.     On December 19, 2007, the Company issued a press release entitled "Force Protection Awarded $379 Million MRAP Contract, Additional Foreign Military Sales Orders to Follow." That release contained positive news regarding the outlook of Force Protection's military contracting relationships:

> Force Protection, Inc. today announced it has received a delivery order for an additional 358 Mine Resistant Ambush Protected (MRAP) Category I and Category II vehicles from the U.S. Marine Corps Systems Command (MARCORSYSCOM), which is acting as the lead contracting agency for the Department of Defense. The total approximate value of the order is $379 million.

> MARCORSYSCOM also advised Force Protection that its Cheetah vehicle proposal is in the competitive range for continued development and testing and will be further evaluated with modifications as part of the ongoing MRAP II competition.

> "In addition to this order from the Marine Corps Systems Command, we intend to continue working with the Army to field the Cougar vehicle in a way that will meet the Army's objective of reducing sustainment and life cycle expense," said Gordon McGilton, CEO of Force Protection, Inc. "The MRAP vehicle program requirements are based on the very design characteristics of our Cougar and Buffalo—the most proven and effective vehicles of this kind in service, and the Army continues to be a valued customer under the MRAP Category III Buffalo program. We are in the process of finalizing a contract for the Buffalo route clearance vehicles to be part of the Ground Standoff Mine Detection System (GSTAMIDS) program of record.

> "We are pleased that the Marine Corps, Navy, and Air Force continue to select our proven Cougar MRAP for their Category I and II vehicle requirements," said McGilton. "The Cougar JERRV variant is already meeting joint service requirements for explosive

ordnance disposal teams and continues to be the gold standard in performance where it matters most—on the battlefield."

In related activities, foreign military sales have also been approved to the United Kingdom and Italy for approximately 300 Cougar and Buffalo vehicles. These contracts have a combined estimated value of $150 million, and include spare parts and sustainment items.

"As U.S. requirements for MRAP vehicles rise and fall, we are pleased to see the release of orders to foreign militaries," said McGilton. "We are aware of several other countries who have expressed additional need for these life saving vehicles, and we expect to receive approval to service them as well."

83.    Despite that positive news, on December 19, 2007, MarketWatch published an article that offered a cautionary note that Force Command could lose ground to other contractors who produce more typical vehicles for the military:

Shares of Force Protection Inc. fell as much as 34% Wednesday after the Defense Department's latest order for its heavily armored trucks came in much lower than expected, worrying investors that the Pentagon is increasingly turning to contractors that can build on well-established supply and maintenance programs.

The military said late Tuesday that it would buy an additional 3,126 armored trucks for $2.66 billion, bringing its total order to 11,941 vehicles for delivery by mid-summer. The largest contract in the new order went to Navistar International Corp.

* * *

Shares of Force Protection closed Wednesday at $4.93, down more than 16%. Earlier the stock traded at a new 52-week low of $3.89.

The Pentagon's decision to award the bulk of new MRAP orders to Navistar highlights a broader theme in modern militaries: a desire for different types of field equipment to share parts to bolster parts availability, cut down service costs and improve performance.

International Military and Government and its parent Navistar already supply heavy trucks to the military for transport and freight, and its MaxxPro MRAP uses a similar engine and chassis.

"We are able to bring forward a scale of commercial-truck and engine manufacturing they don't currently have," a spokesman for the company said. "Generally speaking, the trucks and the MRAP are the same."

Additionally, International Military has more than 1,000 parts and service providers across the world, including dealerships in Iraq and Afghanistan.

"MRAP orders were historically based on who could produce the number the DoD wanted, but greater concern was later based upon commonality with other existing vehicles in the fleet," said Patrick McCarthy, an analyst for Friedman, Billings, Ramsey.

On Monday, McCarthy lowered his rating for Force Protection to underperform from market perform on concerns that the company wouldn't win as many MRAP orders as expected, because its vehicles don't share as many parts with vehicles already in the military's fleet.

Before this week, McCarthy had expected the company to win as much as 40% of the new contracts.

"Commonality is becoming more important, because it enables the military to leverage spare and maintenance capabilities across more types of vehicles, lowering longer-term logistics costs," he said.

Christopher Hinton, *Force Protection Loses Ground to Rivals: Military Weighs Long-Term Costs over Urgent Need for Armored Trucks*, Dow Jones MarketWatch (Dec. 19, 2007) *at* http://www.marketwatch.com/news/story/force-protection-loses-out-military/story.aspx?guid= %7B8A1E11A6-0F3A-4BEC-9D82-9733BD2D1549%7D (last visited April 3, 2008).

84.     After the domestic stock markets closed on February 29, 2008, Force Protection issued a press release entitled "Force Protection Announces Delay in 2007 Form 10-K and Required Restatement of Form 10-Q for the Period Ended September 30, 2007." That release was the first major curative release that revealed the extent to which Force Protection had released unreliable financial results and misleading positive statements:

Force Protection, Inc. today announced that it will delay the filing of its Annual Report on Form 10-K for the year ended December 31, 2007. The Company intends to file its Annual Report on Form

10-K for the year ended December 31, 2007 with the SEC promptly upon the completion of the audit of the consolidated financial statements for the year ended 2007.

Force Protection today also announced that the Company's Audit Committee concluded that *the Company will restate its previously reported interim financial statements for the three and nine month periods ended September 30, 2007.* The Company will file a Form 8-K with the Securities and Exchange Commission with regard to this restatement decision.

The Company reached the conclusion to restate based upon the recommendation of management and the concurrence of the Audit Committee of the Company's Board of Directors. The Company also discussed the matters related to the restatement with Elliott Davis, LLC, the Company's current independent registered public accounting firm. Therefore, *the previously issued financial statements of the Company for the third quarter of 2007 filed on a Form 10-Q on November 13, 2007 should no longer be relied upon. Management discovered significant accounting errors during its year end review, including errors specifically related to the recording of accounts payable related to inventory purchased from a sub-contractor as a result of a contract termination.*

The Company continues to evaluate the impact of the matters described above on its internal control over financial reporting and the Company's disclosure controls and procedures. Management noted it had previously identified and described material weaknesses in its internal control over financial reporting in its Quarterly Report on Form 10-Q filing dated November 13, 2007. As a result of these previously identified material weaknesses and other deficiencies identified during the review of financial statements for the year ended December 31, 2007, *management has concluded internal controls over financial report were not effective as of December 31, 2007. Additionally, management does not believe that the material weaknesses identified as of December 31, 2007 will be remediated by March 31, 2008 and anticipates that material weaknesses will be identified in its Quarterly Report on Form 10-Q for the first quarter of 2008. Therefore, management expects that internal control over financial reporting is likely to be ineffective as of March 31, 2008.*

85.    Force Protection also filed a Form 12b-25, in which the Company announced that it would be delayed in filing its 10-K for year-end 2007. Its narrative statement described the continuing material problems with the Company's internal controls:

> Force Protection, Inc. (the "Company") has determined that it is unable to file its Annual Report on Form 10-K for the year-ended December 31, 2007 by the prescribed due date. As described in further detail below, the Company requires additional time to complete its evaluation of its internal control over financial reporting and preparation of the consolidated financial statements. The Company intends to file its Annual Report on Form 10-K for the year ended December 31, 2007 with the SEC promptly upon the completion of the audit of the consolidated financial statements for the year ended 2007 although it is possible that it will not be filed on or before March 17, 2008. In turn, Elliott Davis, LLC, the Company's independent registered public accounting firm, requires additional time to complete its audit procedures in order to provide the Company with its audit report on the audit of the financial statements and of the Company's internal control over financial reporting.
>
> Although management has not yet completed its evaluation of the Company's internal control over financial reporting, management had, as of December 31, 2007, identified the following material weaknesses in internal control over financial reporting:
>
>   • Ineffective control over the financial statements closing process;
>
>   • Ineffective controls in accounting for inventory and the associated accounts payable expenses related to the receipt of inventory;
>
>   • Insufficient complement of personnel with an appropriate level of accounting knowledge, experience with the Company, and training in the application of general accepted accounting principles (GAAP) in the United States; and
>
>   • Ineffective controls over the completeness and accuracy of deferred tax balances.
>
> In accordance with Section 404 of the Sarbanes-Oxley Act of 2002, the Company has been assessing the effectiveness of its internal control over financial reporting that existed as of

December 31, 2007.  As management's required assessment of internal controls over financial reporting is not complete, *it is possible that the Company will identify one or more additional material weaknesses which, individually or in the aggregate, would constitute a material weakness in internal controls over financial reporting in accordance with Section 404 of the Sarbanes Oxley Act of 2002.* Management has concluded that as a result of above-described the material weaknesses, internal controls over financial reporting are not effective as of December 31, 2007.  Management also does not believe that the material weaknesses, or other deficiencies which may be identified, will be remediated by March 31, 2008. Therefore, the Company expects that internal control over financial reporting is likely to be ineffective as of March 31, 2008 and anticipates that material weaknesses will be identified in its Quarterly Report on Form 10-Q for the first quarter of 2008.

In addition, the Company has also determined that its previously filed interim financial statements for the three and nine month periods ended September 30, 2007 and all public communications of such financial statements should no longer be relied upon because those financial statements contain material misstatements of net income.  Accordingly, the Company plans to restate its historical financial statements for the quarter ended September 30, 2007 and the Company is also reviewing its historical financial statements for the quarter ended June 30, 2007.  The Company is working to complete the restatement of its financial statements for the quarter ended September 30, 2007 and to prepare its financial statements for the year ended December 31, 2007.  The Company is also reviewing its accounting procedures and controls, and the financial reporting processes.

As a result of the scope of the work to be performed to complete its analysis and to identify the material weaknesses in the Company's internal control over financial reporting, including the need to restate its financial statements, it is not practicable for the Company to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2007 by the prescribed due date. The Company is working as expeditiously as possible to finalize the financial statements for the fiscal year ended December 31, 2007 and to file amendments to its previously filed Quarterly Report on Form 10-Q for the quarter ended September 30, 2007.

86.    Following those harsh revelations regarding the absolute failure of the Company to provide accurate financial information to the market, Force Protection's stock collapsed.

Within one business day, investors lost nearly 90% of the value of their Force Protection common stock.

87.    The true facts that the defendants knew, but everyday investors did not, were starkly different than the rosy outlook that the Company and its management presented regularly both before and during the Class Period.

88.    Among those true facts that were not disclosed were the following:

   a.  As a result of the Company's ongoing failure to meet its contractual obligation to provide a certain volume of vehicles to the Government on time, Force Protection would have trouble competing in the MRAP market.

   b.  In audit reports, the DCAA criticized the Company's finances and financial accounting system, which threatened its eligibility for government contracts.

   c.  The Company's accounting department suffered from material weaknesses and deficiencies and lacked the necessary staff and resources to perform its required functions.

   d.  Contrary to its representations and certifications in SEC filings, the Company's internal controls were inadequate and easily manipulated, and, as a result, multiple areas of the Company's internal controls suffered serious deficiencies, including: (i) the financial closing process; (ii) accounting for inventory and the associated accounts payable expenses; (iii) stock-based compensation; and (iv) deferred tax balances.

   e.  The Company lacked effective internal controls in its financial reporting process, required to enable it to properly analyze and/or estimate Force Protection's future financial and operational performance.

   f.  Defendants had caused the Company to falsely report at least its third quarter 2007 financial results.

### FORCE PROTECTION MADE FALSE FINANCIAL REPORTS DURING THE CLASS PERIOD

89.    To inflate artificially the price of the Company's stock, defendants caused the Company to falsely report its results for the third quarter of 2007 through improper accounting entries, which inflated the Company's reported net income.  The Company has admitted that it will be required to restate its prior financial results due to these accounting violations.

90.     The results for the third quarter of 2007 were included in a Form 10-Q filed with the SEC and they were included in press releases disseminated to the public.

91.     Force Protection has now admitted that its previous financial statements were not a fair representation of Force Protection's results and were presented in violation of Generally Accepted Accounting Principles (GAAP) and SEC rules.

92.     GAAP are principles the accounting profession has adopted as necessary to define accepted accounting practice at a particular time. Under SEC Regulation S-X, financial statements filed with the SEC that are not GAAP-compliant are presumed to be misleading and inaccurate, despite footnote or other disclosure.  17 C.F.R. § 210.4-01(a)(1).  Regulation S-X also requires that interim financial statements comply with GAAP, except they need not include disclosures that would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

93.     Ultimately, on February 29, 2008, Force Protection announced that it would be delayed in filing its 10-K for 2007 and it would restate its financials for at least the third quarter of 2007, because there were significant accounting errors in its earlier financial statements, including errors regarding the recording of accounts payable related to inventory purchased from a sub-contractor as a result of contract termination.

94.     That disclosure is an admission that the Company's original financial statements were false and resulted in a material misrepresentation of the income of Force Protection. Under GAAP and in compliance with Accounting Principles Board Opinion ("APB") No. 20, the restatement announced by Force Protection was to correct material errors in its previously issued financial statements.  Moreover, FASB Financial Accounting Standard ("FAS") No. 154 states as follows: "Any error in the financial statements of a prior period discovered subsequent to their issuance shall be reported as a prior-period adjustment by restating the prior-period financial statements."

95.     GAAP, therefore, provides that financial statements should be restated to correct an error in earlier financial statements.  Force Protection's possible restatement is due to an error

and, therefore, would be an admission by Force Protection that its previously-released results and public statements regarding those results were false.

96. Because of those accounting improprieties, the Company violated the following requirements of GAAP-compliance:

a. The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28, ¶10);

b. The principle that financial reporting should provide useful information to present and potential investors, creditors, and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1, ¶34);

c. The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, ¶40);

d. The principle that financial reporting should provide information about how management has discharged its stewardship responsibility to stockholders for the use of enterprise resources entrusted, because—to the extent that management offers securities of the enterprise to the public—management voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

e. The principle that financial reporting should provide information about an enterprise's financial performance during a period, because investors and creditors often use information about the past to asses a business's future prospects . (FASB Statement of Concepts No. 1, ¶42);

f. The principle that financial reporting should be reliable and relevant in that it represents what it purports to represent. (FASB Statement of Concepts No. 2, ¶¶58-59);

g. The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶79); and

h. The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. (FASB Statement of Concepts No. 2, ¶¶95, 97).

97. The undisclosed adverse information concealed by the defendants during the Class Period is the type of information that investors and securities analysts expect to be

disclosed. That information also was likely known by the Company's management and their legal and financial advisors, and that information should have been disclosed.

### FORCE PROTECTION VIOLATED SEC REGULATIONS

98. During the Class Period, the defendants caused the Company to issue materially false and misleading financial statements by circumventing and failing to establish or maintain adequate internal accounting controls over financial reporting. Under section 13(b)(2) of the Exchange Act, every reporting company must meet the following obligations:

> a. make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;
>
> b. devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –
>
> > * * *
> >
> > (ii) transactions are recorded as necessary . . . to permit preparation of financial statements in conformity with [GAAP].

15 U.S.C. §78m(b)(2)(A)-(B).

99. Force Protection and the Individual Defendants violated section 13(b)(2)(A) of the Exchange Act by failing to maintain accurate records. These violations were frequent occurrences, and they repeatedly occurred across numerous reporting periods, including year end reports for 2005, 2006, and 2007, as well as several quarterly reports during the Class Period.

100. The defendants also caused Force Protection to violate section 13(b)(2)(B) of the Exchange Act. They failed to implement procedures reasonably designed to prevent accounting irregularities.

101. The defendants repeatedly verified that Force Protection had adequate internal controls, despite their knowledge of facts to the contrary.

102. Based on the recent revelations regarding the utter failure of Force Protection to have adequate internal controls throughout the Class Period and even into the first quarter of

2008, the statements of the Company and its management to the contrary were false and misleading to the investing public.

103.    Some of the violations that Force Protection is alleged to have committed here are attributable to McGilton, who was an officer of APT Leadership (APT), a technology consulting firm.

104.    Beginning in 2005, Force Protection hired APT to provide the Company with various business consulting services, training seminars and certain business software.  From 2005 through June 30, 2006, APT Leadership billed Force Protection $563,120 for its services, training, and software.

105.    In 2006, Force Protection contracted with APT to use diagrams, methods, concepts, and business operation systems contained in its "APT Tool" software—designed to compete with Microsoft Excel.  Force Protection paid APT a one-time license fee of $60,000 and agreed to pay APT an annual license fee thereafter of $50,000, despite the early-stage development of that unproven product.

106.    Two former officer of Force Protection, Thomas Thebes (then the CFO) and Garth Barrett (the Company's founder), left the Company at least partially because of ethical concerns regarding the self-dealing of McGilton by contracting with APT.  Thebes and Barrett then founded a company specifically designed to compete directly with Force Protection.

## ECONOMIC LOSS

107.    The defendants misrepresented the financial health of the Company, its current operations, and its future prospects.

108.    The erroneous claims to profitability in the Company's public statements resulted in artificially inflated stock prices on a per-share basis.  The defendants intended to effect that artificial inflation through their public disclosures

109.    The partial disclosures regarding the Company's operations and health did not fully cure the issues created by the defendants' false and misleading statements.

110.     When the efficient Nasdaq trading market learned of the true facts surrounding the Company after February 29, 2008, share prices of FRPT plummeted, thereby adjusting to the true health of the Company.

## CAUSES OF ACTION

### COUNT I:  *Violation of Exchange Act Section 10(b) & Rule 10b-5*
### (Against All Defendants)

111.     The Plaintiffs incorporate the preceding paragraphs by reference as if alleged fully here.

112.     During the Class Period, the defendants disseminated or approved the false statements specified above.  They knew or deliberately disregarded the misleading or false nature of those statements, because they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made not misleading, in the light of the circumstances under which they were made.

113.     The defendants violated section 10(b) of the Exchange Act and Rule 10b-because they did the following:

    a.   employed devices, schemes and artifices to defraud;

    b.   made untrue statements of material facts or omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

    c.   engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Force Protection common stock during the Class Period.

114.     The Plaintiffs and the Class have suffered damages because, in reliance on the integrity of the market, they paid artificially inflated prices for Force Protection stock.  The Plaintiffs and the Class would not have purchased Force Protection common stock at the prices they paid—if at all—had they known the true facts surrounding the Company's health and financial reporting, rather than the misleading statements with which the defendants infected the market.

**COUNT II:** *Violation of Exchange Act Section 20(a)*
**(Against All Defendants)**

115.    The Plaintiffs incorporate the preceding paragraphs by reference as if alleged fully here.

116.     The Individual Defendants were controlling persons of Force Protection within the meaning of Exchange Act section 20(a).  Their positions with the Company and ownership of Force Protection stock granted the Individual Defendants the power and authority to cause Force Protection to engage in the wrongful conduct complained of herein, or to cause the Company not to take necessary curative steps.  Force Protection controlled the Individual Defendants and all of its employees.

117.    The defendants, therefore, have violated section 20(a) of the Exchange Act and are liable for that violation.

## PRAYER FOR RELIEF AND JURY DEMAND

118.    The Plaintiffs demand the following judgment and request the following relief on behalf of themselves and the Class:

    a.    An order of this Court that certifies this case as a class action under Rule 23;

    b.    An award of damages, including interest, to the Plaintiffs and the Class;

    c.    An award of reasonable costs and attorneys' fees to the Plaintiffs' counsel; and

    d.    Any equitable, injunctive, or other relief that this Court may determine is just and proper.

119.    The Plaintiffs demand a jury trial on all of the issues in this case that are so triable.

Respectfully submitted, this 17th day of April, 2008.

**Strom Law Firm, L.L.C.**


_____s/J. Preston Strom, Jr._____
J. Preston Strom Jr. (petestrom@stromlaw.com)
Fed. I. D. No. 4354
Mario A. Pacella (mpacella@stromlaw.com)
Fed. I.D. No. 7538
2110 N. Beltline Blvd., Suite A
Columbia, SC  29204-3999
Tel: (803)252-4800/Fax: (803)252-4801

OF COUNSEL:
Joe R. Whatley Jr. (jwhatley@wdklaw.com)
Adam P. Plant (aplant@wdklaw.com)
**Attorneys for Plaintiff**
**Whatley Drake & Kallas, LLC**
2001 Park Place North, Suite 1000
P O Box 10647
Birmingham, AL 35203
Tel:  (205) 328-9576/Fax: (205) 328-9669

Herman "Buck" Watson Jr. (watson@watsonjimmerson.com)
Rebekah Keith McKinney (mckinney@watsonjimmerson.com)
**Watson, Jimmerson, Martin, McKinney, Graffeo & Helms, P.C.**
203 Greene Street, P.O. Box 18368

Huntsville, AL  35804
Tel: (256) 536-7423/Fax: (256) 536-2689